UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH KALNBACH

      Plaintiff,                        Civil Action No. 18-11965

v.                                HON.  LAURIE J. MICHELSON
                                    U.S. District Judge
                                    HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Kenneth Kalnbach ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his  claim for Childhood Disability Benefits ("CDB") and Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED, and  that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI on April 27, 2015 alleging disability as of March 7, 2014 (Tr. 191).  After the initial denial of benefits, he requested an administrative hearing, held on July 11, 2017 in Mount Pleasant, Michigan (Tr. 43).  Administrative Law Judge ("ALJ") Laura Chess presided.  Plaintiff, represented by attorney Jessica Gentile, testified (Tr. 51-60) as did Vocational Expert ("VE") Susan Lyon (Tr. 61-67).  On August 29, 2017, ALJ  Chess found Claimant was not entitled to either CDB before the age of 18 or SSI as of his 18th birthday (Tr. 11-38).  On April 26, 2018, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on June 21, 2018.

## II.  BACKGROUND FACTS

Claimant, born March 7, 1997, was 17 at the time of the alleged onset of disability and 20 when ALJ Chess issued her decision (Tr. 38, 191).  Plaintiff alleges disability resulting from Fragile X,[1] a learning disability, anxiety, Attention Deficit Disorder ("ADD"), and speech problems (Tr. 215).

### A.  Plaintiff's Hearing Testimony

Plaintiff offered the following testimony.

He had never worked (Tr. 51).  He finished 12th grade and received a certificate of completion (Tr. 51).  At the time of the hearing he was attending a program with the goal of

---

[1]

Fragile X syndrome, a genetic condition, "causes a range of developmental problems including learning disabilities and cognitive impairment." https://ghr. nlm.nih.gov/condition/ fragile-x-syndrome. (Last visited July 1, 2019).

-2-

transitioning from school to work (Tr. 51).  He did not know his height or weight (Tr. 52).

He was right-handed (Tr. 52).  He did not have a driver's license but held a learner's permit

(Tr. 52).  He experienced the side effect of sleepiness from prescribed medication (Tr. 52).

Consistent with a post-high school teacher's assessment, Plaintiff believed that he had

normal or close to normal intelligence (Tr. 52-53).  He took "a bit longer" than usual to

express himself verbally (Tr. 53).  Plaintiff had friends while he was in school (Tr. 53).  He

took Paxil for anxiety but did not receive counseling (Tr. 54).  He was currently working

toward getting a job and living on his own (Tr. 54).  He was interested in automobile

electronics (Tr. 55).  Plaintiff could walk for two miles but experienced environmental

allergies (Tr. 55).  He was able to use a microwave and toaster (Tr. 55).

In response to questioning by his attorney, Plaintiff testified that speaking in front of

a large group of people triggered anxiety (Tr. 56).  He also experienced difficulty being in

public (Tr. 56).  He did not believe that he could work at the same pace as other individuals

(Tr. 56).  He required help understanding correspondence from the SSA (Tr. 56).  His father

helped him fill out the application for disability benefits (Tr. 57).  He would be unable to

complete job tasks following "a list of directions" but could learn new tasks by

demonstration (Tr. 57).  He sometimes needed something demonstrated more than once or

needed reminders following demonstration (Tr. 57).  He experienced difficulty performing

more than one activity at a time (Tr. 57).  He was able to pay for items with cash and

calculate the amount of change owed for transactions of 20 dollars or less (Tr. 58).  He was

unable to do division but could do multiplication with the help of a calculator (Tr. 58).  He required extra time to complete projects, assignments, or examinations (Tr. 58).  He was unable to perform laundry chores or follow a recipe (Tr. 59).  He sometimes required reminders to bathe or groom himself (Tr. 59).  He experienced concentrational difficulties but could not think of any concrete examples of such limitations (Tr. 59).  Due to the side effect of sleepiness from Paxil, he took a nap every day, adding that while in school, he was able to complete his classes without a nap (Tr. 60).  At the time of the hearing, he did not believe that he was ready to live on his own (Tr. 60).

### B.   Medical and Academic Evidence

#### 1.  Treating and Educational Sources

September, 2014 physical health treating records were unremarkable (Tr. 310-314).  School records from the same month state that Plaintiff was currently eligible for an "Individualized Education Program" ("IEP") for continued instruction in written expression and Mathematics Calculation (Tr. 324).  School records describe Plaintiff as a "quiet but friendly student" and "very polite and focused" with a slow response time (Tr. 327, 329).  Plaintiff reported that he was "unsure of what training he would like to receive after high school," but as a high school senior he was encouraged to start resume writing and "career exploration" (Tr. 330).  He was placed in general education for all subjects except Science (Tr. 330).  Plaintiff professed interest in electronics repair (Tr. 331).  Intelligence testing showed scores in the low average range with a "deficit" score in visual matching (Tr. 341).

Reading comprehension skills were average (Tr. 342).

In May, 2015, teacher Debra Schafer completed a questionnaire on Plaintiff's behalf, noting that at various times in the past three years she had provided instruction in English, Reading, and Science (Tr. 246). She assessed Plaintiff's reading skills at the seventh grade level and math and written language "below average" (Tr. 246). In the domain of "Acquiring and Using Information" she found mostly "slight" problems with "obvious" problems in participating in class discussions and oral expression (Tr. 247). In "Attending and Completing Tasks," she found at most slight problems with the exception of an "obvious" problems in working at a reasonable pace (Tr. 248). She found no limitation in "Interacting and Relating With Others" or "Moving About and Manipulating Objects" (Tr. 249-250). In the domain of "Caring for Himself," she found no problems except for "taking care of personal hygiene" (Tr. 251). In "Health and Physical Well-Being," Schafer found only that Plaintiff experienced allergies (Tr. 252).

December, 2016 medical records note a normal physical exam (Tr. 391).

A January, 2017 IEP report notes that Plaintiff had good attendance, was well-groomed, and responded appropriately to authority (Tr. 362). Plaintiff was deemed capable of "directly entering employment after finishing school" with "no" areas of concern (Tr. 372). In March, 2017, "Transitions" instructor Daniel Palmer noted that Plaintiff could read at the eighth grade level, perform mathematical problems at the fourth grade level, and write at the seventh grade level (Tr. 279). In the domain of "Acquiring and Using Information" he found

mostly a "serious" problem in participating in class discussions and a "very serious" problem in oral expression (Tr. 280). He otherwise found a lesser degree in other areas in the same domain (Tr. 280). In "Attending and Completing Tasks," he found no problems (Tr. 281). He found no limitation in "Interacting and Relating With Others" except for an obvious problem in making and keeping friends (Tr. 282). He found no limitation in "Moving About and Manipulating Objects," "Caring for Himself," or "Health and Physical Well-Being" (Tr. 283-285). A May, 2017 IEP progress report notes goals of developing communication skills in preparation for work (Tr. 355). Goals to be met by February, 2018 included performing well at job interviews, filling out job applications, and preparing a resume (Tr. 380).

## 2. Non-Treating Sources

In July, 2013, Leon Austin, Psy.D. performed a consultative examination of Plaintiff on behalf of the SSA, noting that Plaintiff had been in special education for the past two to three years (Tr. 296). Plaintiff's father reported that he need reminders to maintain hygiene but liked playing video games and had several close friends (Tr. 297).

Dr. Austin noted cooperative mannerisms and a normal mood (Tr. 297). Plaintiff appeared fully oriented with normal concentration and the ability to count to 100 by "5s" (Tr. 297). He exhibited good immediate and recent memory with appropriate judgment (Tr. 297-298). Intelligence testing placed him in the "low average" range (Tr. 298). Dr. Austin diagnosed Plaintiff with a learning disorder and academic problems (Tr. 299).

The same month, Julie Hartley, M.S. CCC-SLP assessed Plaintiff's speech and

language abilities, finding no deficiencies in the ability to hear but that receptive language skills, total language skills, and speech and articulation were "below age expectations" (Tr. 302-304). Plaintiff appeared fluent (Tr. 306).

In June, 2015, Donovan Royal, Psy.D. performed a consultative psychological examination on behalf of the SSA, noting that Plaintiff was currently taking Paxil for anxiety (Tr. 350). Plaintiff reported that he had some friends and had a good relationship with his father and twin sister (Tr. 351). Dr. Royal noted that Plaintiff was "unable to express himself well or recall information" (Tr. 351). He noted that Plaintiff was neatly groomed and cooperative "but not always cognizant of the procedures and the questions asked of him" (Tr. 351). He noted that Plaintiff presented responses in a delayed manner but exhibited a normal mood (Tr. 351-352). Dr. Royal diagnosed Plaintiff with ADD, and learning disorders in Reading, Math, and Written Expression (Tr. 353). He stated that "With proper technical training," Plaintiff "may be capable of one-step tasks that do not require prolonged attention or decision-making" (Tr. 353).

Later the same month, Ron Marshall, Ph.D. performed a non-examining review of the educational, treating, and consultative records on behalf of the SSA, finding that prior to the age of 18, Plaintiff experienced "less than marked limitation" in the domains of "Aquiring and Using Information" and "Attending and Completing Tasks" (Tr. 77). In the domains of "Interacting and Relating to Others," and "Moving About and Manipulating Objects" Dr. Marshall found no limitation (Tr. 77). He found less than marked limitations in the domain

of "Caring for  Yourself" and no limitation in "Health and Physical Well-Being" (Tr. 78).

In regard to Plaintiff's condition from the age of 18 forward, Dr. Marshall found mild

limitation in activities of daily living, no difficulty in social functioning, and moderate

limitation in maintaining concentration, persistence, or pace (Tr. 78-79).   Dr. Marshall

concluded that Plaintiff could "follow and retain simple instructions," work with others, and

perform "simple, repetitive tasks in a slow pace work environment" (Tr. 81).

### C.  The Vocational Testimony

VE Susan Lyon observed that Plaintiff had no past relevant work (Tr. 61).

ALJ Chess  posed the following set of limitations to the VE, describing a hypothetical

individual of Plaintiff's age, educational level, and lack of past relevant work who could

perform work at all exertional levels[2] but had the following non-exertional limitations:

> There can be only occasional exposure to dust, fumes, odors, gases, mold and
> pollen in the work setting.   There should be no commercial driving.   No
> interaction with the public . . . but there could be occasional interaction with
> co-workers.   This individual can perform routine tasks, repetitive tasks and
> simple tasks defined as those that can be learned within 30 days.   There could
> be only occasional decision making or changes in the work setting.   And there

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light*  work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

should be no production rate or pace work such as work on an assembly line. (Tr. 62).

The VE testified that the individual could perform the exertionally medium, unskilled work of a laundry worker (40,000 positions in the national economy) and light, unskilled work of an assembler (94,000) and packager (61,000) (Tr. 63). The VE testified that if the above-described individual were further limited to work with instructions given "primarily by demonstration" with "only occasional new learning," and only simple mathematical calculations, the job numbers would remain unchanged (Tr. 64). The VE testified that if the same individual also required "direct supervision 10 percent of the workday," and, were off task 10 percent of the workday, the numbers would remain unchanged (Tr. 64-65). She testified that if the individual were off task for 20 percent or more during the workday, all competitive employment would be eliminated (Tr. 65).

In response to questioning by Plaintiff's counsel, the VE stated that the need to be off task for 20 percent or more of the workday, or the need for 60 days of training to learn a job customarily requiring only 30 days of training would be work preclusive (Tr. 65-66).

The VE stated that her testimony regarding interaction with others, decision making, and pacing were based on her own professional experience (Tr. 63-64).

### D.  The ALJ's Decision

Citing the medical and academic records, ALJ Chess found that for the entire period under consideration, Plaintiff experienced the severe impairments of "allergies; learning disorder in the areas of written expression, reading, and mathematics calculation; speech and

language impairment; and [ADD]" but that none of the conditions met or medically equaled any listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1 (Tr. 16-17, 29-30). She found that the condition of anxiety was a non-severe impairment (Tr. 16).

Regarding Plaintiff's condition from the alleged onset of disability to his 18th birthday, the ALJ found that in the domains of "Acquiring and Using Information," and "Attending and Completing Tasks," Plaintiff had "less than marked limitation" (Tr. 24-26). In the domain of "Interacting and Relating to Others," the ALJ also found "less than marked" limitations (Tr. 26-27). The ALJ found no limitations in the domain of "Moving About and Manipulating Objects" (Tr. 27-28). The ALJ found less than marked limitations in the domain of "Caring for Yourself" (Tr. 28-29) and "Health and Physical Well-Being" (Tr. 29).

As to Plaintiff's condition as of his 18th birthday and forward, the ALJ found that he experienced the severe impairments listed above but that none of the conditions met or medically equaled a listed impairment (Tr. 16-17, 29-30). She found that anxiety was a non-severe impairment (Tr. 30). She found Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and in adapting and managing himself (Tr. 30-32).

The ALJ found that Plaintiff retained the Residual Functional Capacity for a full range of exertional work with the following non-exertional limitations:

> The claimant can have only occasional exposure to dust, fumces, odors, gases, mold, and pollen in the work setting. He cannot perform commercial driving. He can have no interaction with the public. He can have occasional interaction with coworkers. The claimant can perform routine tasks, repetitive tasks, and

simple tasks, defined as those that can be learned within 30 days.   The
claimant's work can involve only occasional decision making or changes in the
work setting.  He cannot perform production rate or pace work, such as work
on an assembly line (Tr. 33).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the unskilled

work of a luandry worker, assembler, or packager (Tr. 37-38, 63).  The ALJ supported the

non-disability finding by noting that Plaintiff exhibited clear speech at wellness checkups and

was understandable to teachers and consultative examiners (Tr. 33).  She cited cognitive

testing scores in the low average range (Tr. 33).  She noted that upon examination, Plaintiff

was cooperative, wore clean clothing, exhibited good hygiene, and had a good immediate

memory (Tr. 33).   The ALJ noted that Plaintiff's mental health treatment had been

conservative and that he was currently participating in a program to develop vocational

abilities (Tr. 34).  She accorded partial weight to Dr. Royal's consultative findings, noting

that his finding that Plaintiff would be restricted to one-step tasks stood at odds with

Plaintiff's ability to complete a general geometry class, improved IEP results, and

participation in vocational training (Tr. 23, 35).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative

record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual

determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation

altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed.

126 (1938))(emphasis deleted).   The district court reviews the final decision of the

Commissioner to determine whether it is supported by substantial evidence. *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*).  Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

**A.      Childhood Benefits**

42 U.S.C. § 1382c (a)(3)(C)(I) provides that "[a]n individual under the age of 18 shall be considered disabled" if he or she "has a medically determinable physical or mental impairment which results in marked and severe functional limitations."[3]   In evaluating whether a child is disabled, the Commissioner is to consider, in sequence, whether the child claimant 1) is "doing substantial gainful activity" 2) has a severe impairment, and if so 3) has "an impairment(s) that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.924(a).  In determining whether the child claimant is disabled at the third step, the Commissioner determines functional ability in six domains:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

(v) Caring for yourself; and,

(vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).

---

[3]Childhood claims are subject to the same 12-month durational requirement as adult claims. 42 U.S.C. § 1382c (a)(3)(C)(i)

To establish disability at the third step, "the impairment(s) must . . . result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." *Id.* A "marked" limitation is defined as an impairment(s) that "interferes seriously" with the ability "to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation "interferes *very* seriously" with the ability "to independently initiate, sustain, or complete activities"(emphasis added). 20 C.F.R. § 416.926a(e)(3).

## B. Adult Benefits

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether an adult claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national

economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Disability Under the CDB Claim

Plaintiff advances two theories in support of CDB. First, he argues that he experiences extreme limitation in the domain of Acquiring and Using Information. *Plaintiff's Brief,* 10-11, *Docket #13,* Pg ID 452. Alternatively, he contends that he experiences marked limitation in both Acquiring and Using Information and in the domain of Caring for Himself. *Id.* at 11-16.

As noted above, a finding of either marked limitations in two domains or an 'extreme' limitation in one directs a finding of disability. § 416.926a(b)(1).

In childhood disability claims, an extreme limitation is defined as follows:

> (i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. Extreme limitation also means a limitation that is more than marked. . . . However, extreme limitation does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean. § 416.926a(e)(3).

A marked limitation is defined as follows:

(i) We will find that you have a marked limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. Marked limitation also means a limitation that is more than moderate but less than extreme.  § 416.926a(e)(2) (internal quotations omitted).

## 1.  Acquiring and Using Information

In this domain, § 416.926a(g)(2)(v) provides examples of developmental benchmarks

for children of the ages of 12 to 18:

[Y]ou should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments.  You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

Section 416.926a(g)(3) contains a non-exhaustive list of signs of impairment in Acquiring

and Using Information:

(i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night. (ii) You cannot rhyme words or the sounds in words. (iii) You have difficulty recalling important things you learned in school yesterday. (iv) You have difficulty solving mathematics questions or computing arithmetic answers. (v) You talk only in short, simple sentences and have difficulty explaining what you mean.

However, the mere presence of these limitations does not imply that they are marked or extreme. § 416.926a(f)(3). Instead, determination of whether these impairments are marked or extreme depends upon the available evidence in each case. *Id.*

Substantial evidence supports the ALJ's finding that the limitation in Acquiring and Using Information was less than marked or extreme (Tr. 24-25). The ALJ acknowledged that at a 2013 evaluation, Plaintiff showed deficiencies in general knowledge and the ability to perform calculations (Tr. 25). However, she noted that at a 2015 evaluation Plaintiff exhibited good recall and was able to perform simple calculations (Tr. 25). She observed that as of September, 2014, Plaintiff had improved reading comprehension and written expression skills and was attending general education classes in all subjects except Science (Tr. 25, 330). Elsewhere in the determination, the ALJ cited the May, 2015 assessment by Debra Schafer stating that Plaintiff did not experience a "serious" or "very serious" limitation in Acquiring and Using Information (Tr. 22, 247). My own review of Ms. Schafer's assessment shows that out of the 13 subcategories in this domain, she found no limitation in five categories; "slight" limitation in seven categories; "obvious" limitation in one category but no "serious" or "extreme" limitations (Tr. 248). The ALJ acknowledged a 2017 IEP assessment stating that Plaintiff required improvement in interpersonal skills, interview skills, and in completing a job application but noted that Plaintiff reported that he was able to interact and visit with friends and family without problems (Tr. 24). She noted that Daniel Palmer's March, 2017 functional domain assessment showing somewhat greater limitation

than the May, 2015 evaluation were performed well after Plaintiff's 18th birthday and thus inapplicable to his condition prior to the age of 18 (Tr. 23).  Even assuming that the ALJ adopted Mr. Palmer's finding one "serious" problem  in one out of ten sub-categories of Acquiring and Using Information and a "very serious" problem in one other, Mr. Palmer's findings cannot be interpreted to support an overall finding of marked or extreme limitation in this domain (Tr. 280).

    Plaintiff cites test results from a September, 2014 Woodcock-Johnson Tests of Cognitive Abilities showing a "deficit" classification in Visual Matching more than three standard deviations below the mean, consistent with an "extreme" limitation, arguing that ALJ never addressed Dr. Lenhardt's findings.  *Plaintiff's Brief* at 10; § 416.926a(e)(3)(*see above*).  As an initial matter,  Plaintiff's claim that the ALJ "never addressed" psychologist Lenhardt's findings is contradicted by her acknowledgment that Lenhardt found "significant challenges" in perceptual speed, reading comprehension, developing ideas, and expressing himself (Tr. 20).   The ALJ noted however that during the same month as Dr. Lenhardt's testing, Plaintiff was placed in general education in all but one class and was able to make inside and outside of class (Tr. 20).

    Further, Plaintiff provides no support for the contention that the deficit score in Visual Matching, with otherwise "low average" and "average" scores, requires a finding of extreme or even marked limitation in the domain of Acquiring and Using Information (Tr. 343-344). Even assuming that one "deficit" score constitutes evidence in support of extreme or marked

limitation, the applicable regulation states that the Commissioner "will not rely on any test score alone" and that "[n]o single piece of information taken in isolation can establish whether . . . a "marked" or an "extreme" limitation exists. § 416.926a(e)(4)(i)(*above*). The ALJ provided a four-page discussion of the cognitive testing results, school records, and daily activities which supported a finding of less than marked limitation (Tr. 20-24). She noted that Plaintiff appeared cooperative and attentive with good concentrational skills (Tr. 20-21). She noted that his daily activities included visiting friends, making simple meals, reading, shopping, and playing video games (Tr. 21). Because the ALJ's finding of less than marked limitation in this domain is well supported and explained, a remand on this basis is unwarranted.

## 2. Caring For Yourself

Because the ALJ's finding that Plaintiff experienced less than marked limitation in Acquiring and Using Information is well supported and explained, the issue of whether he experienced marked limitation in the domain of Caring for Yourself is a moot point. However, the record shows that the ALJ did not err in finding less than marked limitation in this domain.

Benchmarks in Caring for Yourself for a child of 12 to 18 include the following:

You should feel more independent from others and should be increasingly independent in all of your day-to-day activities. You may sometimes experience confusion in the way you feel about yourself. You should begin to notice significant changes in your body's development, and this can result in anxiety or worrying about yourself and your body. Sometimes these worries

can make you feel angry or frustrated. You should begin to discover appropriate ways to express your feelings, both good and bad (e.g., keeping a diary to sort out angry feelings or listening to music to calm yourself down). You should begin to think seriously about your future plans, and what you will do when you finish school. § 416.926a(k)(2)(v).

Section 416.926a(k)(3) contains a non-exhaustive list of signs of impairment in the domain of Caring for Yourself but do "not necessarily describe a 'marked' or 'extreme' limitation":

(i) You continue to place non-nutritive or inedible objects in your mouth. (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.(v) You do not spontaneously pursue enjoyable activities or interests. (vi) You have disturbance in eating or sleeping patterns.

In support of her finding of less than marked limitations in this domain, the ALJ acknowledged Debra Schafer's May, 2015 assessment noted problems in caring for personal hygiene and Plaintiff's father's report that Plaintiff required reminders to bathe, use deodorant, take care of his hair, and take medication (Tr. 28-29).  However, the ALJ observed that Plaintiff did not report problems in managing personal care and that he was able to prepare simple meals and perform household chores (Tr. 29).  The ALJ observed that Plaintiff exhibited good grooming and hygiene at consultative examinations and that the record did not contain evidence of "self-injurious behavior" (Tr. 29).

Plaintiff's argument appears to be based primarily on Debra Schafer's May, 2015 finding that in the domain of Caring for Oneself, she found that "taking care of personel hygiene" was a "serious" problem (Tr. 251).  However, Schafer otherwise found that in the 10 sub-categories for this domain, Plaintiff experienced "no problem" in eight sub-categories and only a "slight" problem in knowing when to ask for help (Tr. 251).  Her findings include no problems in handling frustration, being patient, dressing, eating, cooperating, using good judgment, asserting emotion needs, managing his own moods, and applying coping skills in a school environment (Tr. 251).  Although Plaintiff's father also reported the need for hygiene reminders, Plaintiff appeared neatly groomed at a June, 2015 consultative examination (Tr. 351).   While the accounts of Schafer and Plaintiff's father indicate that Plaintiff required hygiene reminders for some period, the record does not suggest that Plaintiff was unable to care for himself, declined suggestions to attend to hygiene, or was unaware of the importance of hygiene in the personal, school, or work setting.  Further, the record suggests that this aspect of self care improved with time and as of January, 2017, "hygiene and grooming" were deemed vocational strengths (Tr. 23, 362).  While the March, 2017 domain assessment was completed well after Plaintiff turned 18, Daniel Palmer found no limitation in any subcategory of this domain, also suggesting that Plaintiff's ability to attend to hygiene continued to improve over the relevant period (Tr. 284).

Because the evidence easily supports the ALJ's finding of less than marked limitation in this domain, a remand on this basis is not warranted.

### B. Dr. Royal's Assessment

Plaintiff also argues that the ALJ erred by according only partial weight to Dr. Royal's June, 2015 consultative evaluation. *Plaintiff's Brief* at 16-18; (Tr. 23, 35, 350-353). Plaintiff contends, in effect, that the ALJ's rationale for declining to give Dr. Royal's conclusion controlling weight is not supported by the record. *Id.*

As a non-treating source, Dr. Royal's one-time evaluation was not entitled to controlling weight. *See Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); 20 C.F.R. 1527(c). Rather, as a consultative rather than treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(*citing Atterberry v. HHS*, 871 F.2d 567, 572 (6th Cir. 1989)).

As discussed in Section II.B.2., *above,* Dr. Royal noted at a June, 2015 consultative examination that Plaintiff was "unable to express himself well or recall information" (Tr. 351). He noted that Plaintiff was "not always cognizant of the procedures and the questions asked of him" (Tr. 351). He also noted that Plaintiff presented responses in a delayed manner (Tr. 351-352). Dr. Royal concluded that "[w]ith proper technical training," Plaintiff "may be capable of one-step tasks that do not require prolonged attention or decision-making" (Tr. 353).

The ALJ acknowledged Dr. Royal's findings at three separate points in the administrative determination (Tr. 21, 23, 35). Aside from noting Dr. Royal's observations of significant limitation, she cited Dr. Royal's finding that Plaintiff was cooperative, denied

hallucinations, exhibited a normal mood, was able to repeated six digits forward and three backward, and could remember three of three objects after a three-minute delay (Tr. 21). The ALJ adopted Dr. Royal's findings that Plaintiff experienced some degree of functional limitation but rejected his finding that Plaintiff was at best limited to one-step tasks (Tr. 23). She noted that the IEPs created after June, 2015 showed improvement in cognitive skills (Tr. 23). She noted that Dr. Royal's conclusions did not correlate to the functional domains used in making a CDB claim (Tr. 23). In making the determination that Plaintiff was not eligible for adult disability benefits, the ALJ cited Dr. Royal's conclusions once again, noting that while she gave the consultative findings partial weight, she rejected his finding that Plaintiff was incapable of "prolonged attention or decision-making" noting that "'prolonged' [was] not a well-defined vocation term" (Tr. 35). The ALJ's accord of partial weight to Dr. Royal's opinion is particularly deserving of deference because she "did not simply ignore or discard [the] findings," but instead "discussed those findings in detail and, to a large extent, adopted them." *Barker* at 794.

Further, even assuming that Dr. Royal's conclusion can be read as a "disability" opinion under either CDB or SSI, substantial evidence generously supports the opposite conclusion. As to the CDB claim, Debra Schafer's May, 2015 domain assessment supports the ALJ's finding that Plaintiff did not experience more than "less than marked" limitation in any domain (Tr. 246-252). Likewise, Dr. Marshall's non-examining domain assessment from the following month showed that Plaintiff did not experience more than "less than

marked" limitation (Tr. 77-78). The ALJ noted that Plaintiff's treatment had been conservative and that his medication was limited to Paxil for anxiety (Tr. 33-34).

As to the claim for SSI, A January, 2017 IEP report notes that Plaintiff was deemed capable of "directly entering employment after finishing school" (Tr. 372). None of the records suggest that Plaintiff was incapable of Substantial Gainful Activity or that he was limited to "sheltered" work. While in March, 2017 instructor Daniel Palmer noted significant problems in oral expression and class participation, the RFC for simple, routine, non-production rate work with "no interaction with the public" and only occasional interaction with coworkers adequately addresses those findings (Tr. 32-33).

Because the ALJ's determination that Plaintiff was not entitled to CDB prior to the age of 18 or SSI as of his 18th birthday is well within the "zone of choice" accorded to the fact-finder at the administrative hearing it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #13] be DENIED.

-24-

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  July 8, 2019

## CERTIFICATE OF SERVICE

I hereby certify on July 8, 2019, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 8, 2019.

s/Carolyn M. Ciesla

Case Manager to

Magistrate Judge R. Steven Whalen